**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 14-cv-02560-CMA-MJW

KRISTIN PUNT,

      Plaintiff,

v.

KELLY SERVICES, and
GE CONTROLS SOLUTIONS,

      Defendants.

---

**ORDER GRANTING DEFENDANT GE CONTROLS SOLUTIONS' AND DEFENDANT
KELLY SERVICES' MOTIONS FOR SUMMARY JUDGMENT**

---

Plaintiff Kristin Punt brings this employment discrimination case alleging two claims for relief against GE Control Solutions and Kelly Services:  (1) a claim of disability discrimination under the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 2000e *et seq*., and (2) a claim of genetic information discrimination under the Genetic Information Nondiscrimination Act ("GINA"), 42 U.S.C. § 2000ff *et seq.* (Doc. # 1.)  This matter is before the Court on Defendant GE Controls Solutions' Motion for Summary Judgment, as well as Defendant Kelly Services' Motion for Summary Judgment.  (Docs. ## 50, 54.)  As explained in greater detail below, because Punt has failed both (1) to establish a *prima facie* case of disability discrimination or to show that GE Control Solutions' legitimate, nondiscriminatory reason for her termination was

pretextual, and (2) to establish *prima facie* case of genetic information discrimination

under GINA, the Court grants the instant Motions.

## I.  BACKGROUND

### A.  FACTS[1]

GE Controls Solutions is a company in Longmont, Colorado, that designs and

produces hardware, software, and other materials for its parent company, General

Electric.  (Doc. # 54-2 at 1.)  To meet some of its staffing needs, GE Controls Solutions

("GE") entered into an agreement with Kelly Services ("Kelly"), a company that provides

temporary staffing services.  (Doc. # 54-3 at 1, 4–6.)  Under the agreement, Kelly

provided and assigned temporary employees to GE as needed.  (*Id.*)  Additionally, GE

could request that Kelly remove any of these temporary employees from their

assignment at GE.  (*Id.*)  Likewise, Kelly itself could cancel any employee's assignment.

(*Id.*)

Punt was an at-will employee of Kelly.[2]  (Doc. # 54-6 at 7, 8.)  When she initially

applied for employment with Kelly, Punt's employment Application stated that "The

duration of any assignment I accept depends on the needs of Kelly's customer and may

be canceled at any time by Kelly or the customer."  (Doc. # 50-2 at 2.)  The Application

also provided that

> Upon completion of each assignment, I will notify Kelly of my availability
> for work.  I understand I am responsible for maintaining regular contact

---

[1] The following facts are undisputed, unless otherwise noted.

[2] Whether Ms. Punt should also be considered an employee of GE is disputed, but is assumed for the purposes of the instant Motion.

> with Kelly and failure to do so will indicate I have either voluntarily quit or
> am not actively seeking work.

(*Id.*)  Punt signed an acknowledgement at the bottom of the Application, indicating that

she read it, understood it, and agreed to its terms.  (*Id.*)

After GE's regular receptionist retired, GE requested that Kelly assign a

temporary employee to fill that position.  (Doc. # 65-4 at 3–4.)  Joy Hansen, GE's

Director of Human Resources at the time, contacted Erin Wilgus, a Kelly employee, and

mentioned that GE would consider Ms. Punt for the receptionist assignment because

Ms. Punt had previously been assigned to work as a receptionist at GE on temporary,

short-term assignments.  (*Id.* at 4.)

Kelly, through Wilgus, subsequently assigned Punt to the receptionist position at

GE, and her employment began on October 24, 2011.  (Doc. # 54-5 at 7–8.)  Punt was

directed to work a forty-hour work-week, starting at 7:30 a.m. and ending at 4:30 p.m.

(*Id.* at 9.)  Physical presence and attendance at the workplace were part of Punt's job

duties and were listed as such in the receptionist job description.  (Docs. ## 54-6 at 2,

10; 54-11 at 1.)  GE asserts that it instructed Punt that if she were to be absent or late,

she was expected to contact someone at GE to let them know.  Specifically, GE

contends that Punt was supposed to contact both Kelly and GE.  (Doc. # 54-5 at 8.)

Punt denies that she was supposed to contact GE, and asserts that she was supposed

to contact Elise Greenlee, the administrative assistant to Sledge (GE's former Global

Sales Leader for Inspection Technologies), if she as ever going to be late or absent.

(Doc. # 65-1 at 24–25.)  However, the parties do not dispute that if Wilgus knew that

Punt was to be absent, Wilgus would contact GE directly to inform it of her absence. (Doc. # 65-1 at 23.)

During the course of her six weeks of employment with GE, Punt never worked a full, forty-hour work week.  Specifically, she was absent from work on six occasions: November 11, November 15, November 23, November 25, November 28, and November 29.  (Doc. # 54-10 at 1–2.)  The GE office was closed on November 11 and November 25 for holidays.  (Doc. # 65-1 at 10–11.)  Three of Punt's other absences correspond with documented medical appointments.  Specifically, on November 15, Punt had a biopsy of her right breast.  (Doc. # 54-5 at 10, 11.)  On November 23, Punt had her first appointment with her cancer physician.  (Doc. # 65-1 at 13–16.)  On November 28, Punt had an appointment with her cancer surgeon.  (*Id.* at 17.)

Punt was also late to work on three occasions: by an hour and a half on October 24, by four and a half hours on October 27, and by three hours on November 30.  (Doc. # 54-10 at 1–2.)  The November 30 date corresponds with an MRI appointment, but the other two occasions of tardiness are unexplained.  (Doc. # 65-1 at 19–20.)  Finally, Punt left work early on three occasions: by 30 minutes on October 27, by an hour and fifteen minutes on November 2, and by five hours on November 22.  (Doc. # 54-10 at 1.)  On November 2, Punt had a follow-up mammogram appointment.  (Doc. # 65-1 at 9.)  On November 22 or 25, Punt received a call from her doctor's office with the results of her biopsy.[3]

---

[3] The parties dispute the exact date Punt received her diagnosis.  (Doc. ## 69 at 3, 73 at 2–3).

Punt's other absences, late arrivals, and early departures do not correspond with medical appointments and remain unexplained by Punt.  (Doc. # 65-5 at 9–10, 11–12.)  As for the ones that do correspond with medical appointments, Punt asked for the time off in advance for some, but not all, of these dates.  Specifically, it is undisputed that Punt asked Wilgus for time off for the biopsy on November 15.  (Doc. # 65-1 at 29.)  Punt also asserts that she asked Joy Hansen, another GE employee, for time off for other appointments and tests, though she does not specify the appointments for which she made these requests, and she testified in her deposition that she believed that the requests were made within two weeks of the end of her assignment.  (Doc. # 65-1 at 32.)

Punt alleges that she told Wilgus and Greenlee about her family history of breast cancer prior to her biopsy; her mother, grandmother, great grandmother, cousin, and aunt all suffered from the disease.  (Doc. # 65-1 at 27.)  The parties dispute whether she told Joy Hansen about her family history of breast cancer.  (Docs. ## 65 at 4, 69 at 3.)  The parties also dispute whether Sledge knew of Punt's family history of breast cancer.  (Docs. ## 65 at 6, 69 at 5.)  After her biopsy results indicated that Punt, in fact, had breast cancer, Punt also told Wilgus and Greenlee about the diagnosis.  (Doc. # 65-1 at 27, 31.)

On December 5, Punt had another MRI appointment.  (Doc. # 65-1 at 34.)  On that day, Punt emailed Wilgus at 10:37 a.m., stating:

> After talking to my husband and doctor it is in my best interest not to come to work this week at all.  I like my job at GE very much but I'm concerned that they are not going to be willing to work with me.  I have barely missed work and they are already annoyed it sounds.  I was told to tell Elise

> [Greenlee] when I would be late because Joy gets in between 8:30 and
> nine in the morning . . . . Getting surgery takes some appointments and
> tests and it sounds like GE [doesn't] want me to take off anytime.  I guess
> we should both be concerned if this will be a right fit.  Let me know what
> you think.  I hope to continue on Monday.

(Doc. # 65-1 at 35–36.)  That same day, at 5:47 p.m., Wilgus emailed Punt stating:

"Please contact me ASAP.  I need to let GE know whether you are going to be at work

tomorrow."  (*Id.* at 35.)  Punt responded by email at 6:35 p.m., stating:

> I have so much to take care of this week with tests that I don't know how I
> can come to work tomorrow… If taking a week off is out of the question I
> understand.  Elise [Greenlee] doesn't have that much work to do
> according to her and I'm surprised this has become such a problem. This
> is looking like very early stage breast cancer that will allow me to come to
> work and have only five times of radiation.

(*Id.* at 34–35.)[4]

On or around December 5, Hansen and Sledge contacted Wilgus to end Punt's

assignment, stating that GE "needed an employee that's [sic] going to be able to show

up and fulfill the needs of the position."[5]  (Doc. # 54 at 10–11).  Hansen personally

spoke with Wilgus and stated that she was aware that Punt had missed consecutive

days of work and that Punt was undergoing medical treatment, but that GE needed

someone who would show up at work.  (Doc. # 65-1 at 40.)  Wilgus subsequently

informed Punt that GE was terminating her assignment.  (*Id.* at 40–41.)  Punt alleges

that, in the course of this conversation, Wilgus also told her that Hansen had told Wilgus

that Punt would be "unreliable" now that Punt had been diagnosed with breast cancer.

---

[4] Hansen and Sledge state that they were not aware of these email communications between
Punt and Wilgus before they decided to terminate Punt's assignment.  Punt disputes this.

[5] Punt disputes this rationale.

(*Id.* at 33, 42.)  Wilgus testified that she never said this to Punt.  (Doc. # 69-1 at 6.)

After Punt's assignment to GE was terminated, Greenlee was asked to fill in for Punt's

receptionist duties until GE found a replacement.  (Doc. # 65-1 at 31.)  On February 13,

2012, Kelly offered Ms. Punt an additional assignment after her assignment with GE – a

one-day assignment at Array BioPharma, which she turned down because she was

working.  (Doc. # 50-1 at 98, 101.)  Punt also admitted that Kelly never officially

terminated her, and that she knew that she had an obligation to call Kelly to advise them

she was available for work and that had done so ("practically harassed them for work")

in the past.  (*Id.* at 96–97, 103.)  Punt also testified that she contacted Kelly "once" to

tell them that she was available for work, but after being asked when she did so, she

stated "They knew I was available for work . . . I don't know," and when she was asked

again, stated "I don't know [if I called Kelly], because I was filing an EEOC claim."  (*Id.*

at 95–96.)  She also admitted that she "probably" did not call Kelly to ask them for work

after December 5, 2011.  (*Id.* at 97.)

## B.  PROCEDURAL HISTORY

On September 16, 2014, Punt filed her Complaint against both GE and Kelly,

alleging claims of relief for disability discrimination under the ADA and genetic

information discrimination under GINA.  (Doc. # 1.)  Kelly filed a Motion for Summary

Judgment on July 23, 2015, and GE filed a Motion for Summary Judgment on July 24,

2015 (Doc. ## 50, 54.)  On August 31, 2015, Punt filed a Brief in Opposition to both

Motions.  (Doc. ## 64, 65.)  Both GE and Kelly filed timely Replies.  (Doc. ## 68, 69.)

Finally, the Court granted leave to allow Punt to file a Sur-Reply.  (Doc. # 73.)

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law.  *Wright v. Abbott Labs.*, Inc., 259 F.3d 1226, 1231–32 (10th Cir.  2001).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997).  In reviewing motions for summary judgment, a court may not resolve issues of credibility, and must view the evidence in the light most favorable to the non-moving party—including all reasonable inferences from that evidence.  *Id.*; *Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1251 (10th Cir. 2013) ("a judge may not make credibility determinations on summary judgment"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor.").  However, conclusory statements based merely on conjecture, speculation, or subjective beliefs do not constitute competent summary judgment evidence.  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.  *Id.*  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point the Court to a lack of evidence for the other party on an essential

element of that party's claim.  *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.  *Id.*  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the non-movant."  *Adler*, 144 F.3d at 671.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Id.*  Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  *Id.* at 249 (citations omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial).

### III.  ANALYSIS

**A.  GE'S MOTION FOR SUMMARY JUDGMENT**

**1.  Punt's Disability Discrimination Claim**

    **a.  Whether the Court Should Apply *McDonnell Douglas* Burden Shifting**

Punt and GE disagree about which analytical framework should be applied to Ms.

Punt's ADA claim.  Specifically, GE analyzed Punt's claim under the *McDonnell Douglas*

burden-shifting framework (Doc. # 54 at 13), which applies when there is circumstantial

evidence of discrimination and the employer disclaims reliance on the plaintiff's

disability as the basis for its employment decision.  *See MacKenzie v. City & Cnty. of*

*Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005); *Morgan v. Hilti, Inc.*, 108 F.3d 1319,

1323 n. 3 (10th Cir. 1997).  Punt counters that her claim should be analyzed as a

failure-to-accommodate claim because she alleged direct evidence of discrimination; as

such, the burden-shifting framework does not apply in her case.[6]  (Doc. # 65 at 13.)

Additionally, despite the fact that this Court allowed Punt to file a Sur-Reply brief, Punt

failed to respond to GE's presentation of a burden-shifting case.  Instead, she only

reiterated her claims based on the direct evidence standard.  (Doc. # 73.)

The ADA prohibits discrimination against a "qualified individual with a disability

on the basis of the disability."  *Valdez v. McGill*, 462 Fed. App'x. 814, 817 (10th Cir.

---

[6] Throughout her briefing, Punt effectively conflates the issues of whether GE had notice of her claim (as a reasonable accommodation claim) with whether her ADA claim should be analyzed as a failure-to-accommodate claim, as though the way her Complaint framed her claims somehow dictates the proper framework the Court should apply.  Although GE's notice might be relevant to other legal issues (for example, in the administrative exhaustion context, notice may limit the types of charges that may be brought against an employer), at summary judgment, the Court is charged with an entirely different task: determining which analytical framework should be applied, and deciding whether the plaintiff has shown that there are genuine disputes of material fact that need to be resolved at trial.

2012) (quoting 42 U.S.C. § 12112(a)) (unpublished).  To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that: (1) she is a disabled person as defined by the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held; and (3) her employer discriminated against her because of her disability.  *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1217 (10th Cir. 2010); *see also MacKenzie*, 414 F.3d at 1274 (10th Cir. 2005) (same).

Where a plaintiff seeks to establish an ADA violation through circumstantial evidence, the Court applies the three-step analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *MacKenzie*, 414 F.3d at 1274.  Under that framework, Plaintiff must first establish a *prima facie* case of discrimination; if Plaintiff can do so, "the burden [then] shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision.  Should the defendant articulate a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether defendant's reason for the discharge is pretextual." *Johnson*, 594 F.3d at 1217 (citation omitted). However, at all times, the plaintiff bears the ultimate burden of proving discrimination.  *Butler v. City of Prairie Vill*, 172 F.3d 736, 748 (10th Cir. 1999) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993)).

In contrast, because the ADA also defines discrimination as an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," 42 U.S.C. § 12112(b)(5)(A), if a plaintiff has direct evidence of discrimination, or if the employer expressly admits that it relied on the plaintiff's disability in deciding to take an adverse action against the employee, "the

burden-shifting framework may be unnecessary and inappropriate." *Morgan,* 108 F.3d at 1323 n. 3. "Direct evidence requires proof of an existing policy which itself constitutes discrimination **or oral or written statements on the part of a defendant showing a discriminatory motivation**." *Cuenca v. Univ. of Kan.*, 101 Fed. App'x. 782, 788 (10th Cir. 2004) (unpublished) (emphasis added, internal citations and quotations omitted).  It is "evidence, which if believed, proves the existence of a fact in issue without inference or presumption. . .  A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 854–55 (10th Cir. 2007).  Additionally, statements which on their face are expressions of personal opinion can only support an inference of discrimination if the trier of fact finds the inference reasonable; by definition, then, such statements constitute only circumstantial or indirect evidence of discrimination against the plaintiff.  *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996); *see also Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (internal quotation omitted, emphasis added) ("Direct evidence is 'evidence from which the trier of fact may conclude, **without inference**, that the employment action was undertaken because of the employee's protected status.'").  In cases involving direct evidence,

> an employer will defend its decision on the ground that the plaintiff is not otherwise qualified for the position, with or without reasonable accommodation. **The *McDonnell Douglas* burden shifting approach is unnecessary [in such cases] because the issue of the employer's intent has been admitted and the plaintiff has direct evidence of discrimination on the basis of his disability.** If the plaintiff in [ ] such a

case is in fact statutorily disabled, **the determinative issue in the case will not be the employer's intent**, **but whether the employee is "otherwise qualified,"** with or without reasonable accommodation, to perform the job, a factual dispute that is resolved through traditional methods of proof.

*Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003) (emphasis added).

In *Davidson*, the Court found that there was direct evidence of disability discrimination against the plaintiff, a deaf person, such that *McDonnell Douglas* did not apply, because the company's explanation for its refusal to hire the plaintiff was that "he was unable to perform the jobs available for external hire, that is, the positions [which did not require employees to speak on the phone] . . . **In other words, [its] explanation**

**. . . established that it relied on [the plaintiff's] disability when it refused to hire him**." *Id.* (emphasis added).  In other direct evidence cases, employers either had a policy on their books which itself constituted discrimination, or have openly admitted that they took an adverse employment action **in reliance on** the employee's disability.  *See Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 n.4 (10th Cir. 2015) (*McDonnell Douglas* was not applicable because employer expressly admitted that the plaintiff's medical condition "played a prominent part in its decision to place him on unpaid leave"); *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 n.6 (10th Cir. 2015) (same, because it was undisputed that employer had rescinded the plaintiff's employment offer because she was deaf).

Punt characterizes several items of evidence as constituting direct evidence of discrimination.  First, she conclusorily asserts that "GE's ending of plaintiff's assignment was **based upon her absences for her cancer tests** so this is a direct evidence/failure

to accommodate case." (Doc. # 65 at 13) (emphasis added). However, the record evidence indicates that GE never explicitly told Punt that it was basing her termination on her cancer diagnosis and/or their inability to accommodate such a diagnosis; rather, it told Wilgus, in explaining why it wished to terminate Punt, that it "needed an employee that's [sic] going to be able to show up and fulfill the needs of the position" – i.e., it told her that it terminated her based on her **absences**, **not her disability**. (Doc. # 54 at 10–11.) GE also notes that Punt could not explain the full extent of her absences and tardiness, that most of her absences were unrelated to her cancer, and the fact that Punt did not tell GE that each absence was for a doctor's appointment, such that GE's explanation that they were terminating her due to her absences in no way "directly" shows, **without further inference**, that GE was motivated to terminate Punt's assignment due to her cancer. (Doc. # 69 at 9.)

Punt also alleges that when Wilgus was informing her that she was being terminated by GE, Wilgus also told her that Hansen had earlier told Wilgus that Punt would be "unreliable" now that Punt had been diagnosed with breast cancer. (Doc. # 65-1 at 33, 42.) However, such evidence, even fully credited, is not "direct" evidence of GE's motive because it is Hansen's personal opinion, and as such, constitutes only circumstantial (i.e., indirect) evidence of discrimination, as the trier of fact must still **infer** that this personal opinion about Punt's reliability due to her breast cancer diagnosis motivated GE's adverse action. *See EEOC v. Wiltel, Inc.*, 81 F.3d 1508, 1514 (10th Cir. 1996) (noting that statements which are merely expressions of personal opinion or bias do not constitute direct evidence of discrimination, but rather are "at most circumstantial

evidence of discriminatory intent," because "such statements require the trier of fact to

infer that discrimination was a motivating cause of an employment decision"); *Tomsic*,

85 F.3d at 1477 (same); *Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1008 (10th

Cir. 1990) (for evidence to be "direct evidence" of discrimination, "the evidence would

need to show that [an employer] **acted on [its] discriminatory beliefs**.")  For example,

in *Furr v. AT & T Techs., Inc.*, 824 F.2d 1537, 1547 (10th Cir. 1987), the Tenth Circuit

explained that a particular manager's statements that plaintiffs were too old to learn new

technologies and too old to be in supervisory positions did not constitute "direct"

evidence of discrimination; rather, such remarks were circumstantial evidence because

they were "specific instances of discriminatory statements" from which the reasons for

the adverse employment decisions would have to be inferred.  *Id.* at 1549.  *Furr*'s

reasoning applies with equal force in the instant case.

  As further support for her contention that the instant case should be analyzed as

a failure-to-accommodate claim, Punt also argues that she was "qualified" for the

position with a reasonable accommodation.  (Doc. # 73 at 4.)[7]  Specifically, Punt asserts

that her requests for time off on November 28 and November 29 constituted a request

for a reasonable accommodation.  (*Id.*)  However, these two requests only pertained to

those specific dates, and while they could have been construed as requests for a

reasonable accommodation **on those days**, the requests did not address any

---

[7] Importantly, the question of whether an employee is "qualified" with a reasonable accommodation is not only relevant in failure-to-accommodate cases, but also when there is circumstantial evidence of discrimination, as it is an element of the *prima facie* case under the *McDonnell Douglas* framework.  Further, that Punt amended her charge with the EEOC to allege that GE "failed to provide her with a reasonable accommodation" is not determinative. (Doc. # 73 at 4–5.)  The relevant inquiry is whether there is direct evidence of discrimination.

prospective accommodation for breast cancer treatment or specify the expected

duration of her impairment. (Doc. # 1 at 4, 5.) In the same Sur-Reply brief, Punt

simultaneously asserts that her request for a reasonable accommodation was actually

the December 5th email. (Doc # 73 at 9.) As for that email, it was sent to a Kelly

employee and was not a sufficiently definite request for an accommodation. Therefore,

it does not establish that there is a dispute about GE's admitted rationale for its adverse

action, but only about whether such an accommodation would have made Punt

qualified. *See Davidson*, 337 F.3d at 1189 (explaining that in failure-to-accommodate

cases, "[t]he *McDonnell Douglas* burden shifting approach is unnecessary because the

issue of the employer's intent has been admitted and the plaintiff has direct evidence of

discrimination on the basis of his disability").

The Court agrees with GE that the instant matter is not properly categorized as a

failure-to-accommodate case, because it does not involve direct evidence or a facially

discriminatory policy. In *Hawkins*, *Davidson*, and *Osborne*, the employers **expressly**

**admitted** that their adverse employment actions were taken **because of** the

employee's disability; thus, the employer's motive was simply not at issue in those

cases, rendering the *McDonnell Dougla*s framework both unnecessary and

inappropriate. *See Hawkins*, 778 F.3d at 883 n. 4; *Osborne*, 798 F.3d 1260 at n.6;

*Davidson*, 337 F.3d at 1189. By contrast, in the instant case, GE expressly denies that

it relied on Punt's disability in deciding to terminate her, and instead claims that it relied

only on her extensive, largely unexplained absences, and there is no direct evidence to

indicate that she was terminated because of her disability. As such, the *McDonnell*

*Douglas* burden-shifting framework is appropriate and will be applied in the instant case. *See Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736, 747 (10th Cir. 1999) (quoting *Morgan*, 108 F.3d at 1323 n. 3) ("The *McDonnell Douglas* analysis is particularly appropriate where, . . . 'the employer disclaims reliance on the plaintiff's disability for an employment decision.'")

**b. Whether Punt was Disabled Under the Americans with Disabilities Amendment Act ("ADAAA")**

GE argues that Punt was not "disabled" because she was diagnosed with breast cancer at the end of her assignment, and that a diagnosis alone is insufficient to establish a disability under the ADA. (Doc. # 54 at 13–14.) It also contends that Punt did not inform anyone at GE that her diagnosis substantially limited a major life activity, request an accommodation, or provide information about how her diagnosis affected her ability to perform her work. (*Id.* at 14.)[8] In response, Punt contends that the passage of the Americans with Disabilities Amendment Act ("ADAAA") effectively made cancer a "disability" because it expanded the definition of "major life activity" to include normal cell growth. (Doc. # 65 at 14–15.) Per this updated definition of disability, the Court finds that Punt satisfies the first element of her *prima facie* case.

The ADA defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities . . . (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(1). "The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision." *Cisneros v.*

---

[8] Kelly makes similar arguments in its Motion for Summary Judgment. (*See* Doc. # 50 at 11-14.)

*Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000) (citation omitted), *overruled on other grounds by Bd. of Trs. Of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001).

Congress passed the ADAAA with the explicit purpose of "reinstating a broad scope of protection . . . under the ADA," Pub.L. No. 110–325 § 2(b)(1), 122 Stat. 3553–3554 (2008), and stated that "it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.* § 2(b)(5). To that end, the ADAAA added language to the ADA providing for a broad construction of the definition of disability. 42 U.S.C. § 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."). Additionally, the definition of a "major life activity" was specifically expanded in the ADAAA, to include "operation of a major bodily function, including . . . normal cell growth." *Id.* § 12102(2)(B). As the Equal Employment Opportunities Commission (EEOC) implementing regulations state, "it should easily be concluded that ... cancer substantially limits [the major life activity of] normal cell growth" and accordingly, constitutes a disability. 29 C.F.R. § 1630.2(j)(3)(iii).

Based upon the ADAAA and the EEOC's post-enactment regulations, several courts have held that a plaintiff's cancer is a disability for purposes of the ADAAA. *See Norton v. Assisted Living Concepts, Inc.,* 786 F.Supp.2d 1173, 1185 (E.D. Tex. 2011) (remissive cancer is a disability under the ADAAA); *Hoffman v. Carefirst of Fort Wayne,*

18

*Inc.,* 737 F.Supp.2d 976, 985–86 (N.D. Ind. 2010) (same); *Chalfont v. U.S. Electrodes,*

No. 10–2929, 2010 WL 5341846, at *9 (E.D. Pa. Dec. 28, 2010) (unpublished) (same).

Here, it is undisputed that Plaintiff was diagnosed with cancer, and that she underwent

surgeries and treatment for her cancer; therefore, Plaintiff has adequately alleged that

she had a disability under the ADA.

The Court gives no credence to GE's contention that Punt failed to inform anyone

at GE that her condition impaired a major life activity. The statute clearly defines the

disability in reference to the actual **impairment**. The employer's knowledge of that

impairment is relevant to later portions of the analysis, such as the reason for the

adverse action, but not to the fact of disability itself. Further, that her diagnosis

occurred partway through her assignment is also irrelevant because the question of

whether a person is disabled is determined with reference to their condition at the time

of the adverse action. Because it is undisputed that Punt was diagnosed with cancer

before December 5, the date her assignment was terminated, the Court finds that Punt

was a "disabled" person as defined by the ADA.[9]

### c. Whether Punt was "Qualified" to Perform the Essential Functions of Her Job With a Reasonable Accommodation

GE contends that Punt does not establish the second element of the *prima facie*

case – to show that she was qualified, with or without reasonable accommodation, to

---

[9] The parties also dispute whether GE can be held liable as Punt's employer for its decision to terminate Punt's assignment. GE argues that it did not cause Punt to suffer an adverse employment action because even though it requested that Kelly end Punt's assignment at GE, Kelly continued to employ her. (Doc. # 54 at 15.) Punt argues that GE is liable for its decision to terminate her assignment because both Kelly and GE were her employers. (Doc. # 65 at 18). The Court acknowledges that GE has not admitted to being a joint employer with Kelly. (Doc. # 54 at 13, n.3). However, the Court will assume that it is Punt's employer for the purposes of the instant Motion.

perform the essential functions of the job held – because she could not perform the essential function of being physically present at her job.  (Doc. # 54 at 14.)  Specifically, GE argues that although a modified work schedule to allow Punt to obtain treatment and recover from that treatment **could** constitute a reasonable accommodation in some circumstances, there is no evidence that Punt requested such an accommodation, or that such an accommodation would be reasonable in light of the requirement that Punt be physically present at work as the receptionist.  (*Id.* at 14–15).  Punt counters that while attendance is plausibly an essential function of **any** job, a request for leave may be a reasonable accommodation where it allows the employee to recover and then perform the essential elements of the job in the near future.  (Doc. # 65 at 16.)

   The plaintiff bears the burden of showing she is able to qualified, with or without reasonable accommodation, to perform the essential functions of her job.  *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002).  To determine whether an individual is "qualified" under the ADA, the Court employs a two-part test:

> First, the court determines whether the individual can perform the essential functions of the job.  Second, if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable him to perform those functions.

*Davidson*, 337 F.3d at 1190 (citations omitted) (quoting *Aldrich v. Boeing Co.*, 146 F.3d 1265, 1271 (10th Cir. 1998)).  Because the parties do not dispute that physical attendance is an essential function of Punt's former receptionist position, the Court moves to the second part of this inquiry.

A reasonable accommodation is one that "presently, **or in the near future**, enable[s] the employee to perform the essential functions of his job." *Hudson v. MCI Telecommunications Corp.,* 87 F.3d 1167, 1169 (10th Cir. 1996) (citation and internal quotation marks omitted) (emphasis added).  Accordingly, a request for leave can be a reasonable accommodation when it "allow[s] an employee sufficient time to recover from an injury or illness such that the employee can perform the essential functions of the job (i.e., attend work) in the future." *Cisneros*, 226 F.3d at 1129.  However, a request for indefinite leave is not a reasonable accommodation because it "does not allow the employee to perform the essential functions of the job in the near future." *Id.* Rather, the Tenth Circuit has required that, in making leave requests, employees give the employer "an expected duration of the impairment (not the duration of the leave request)." *Id.* at 1130 (emphasis in original); *see also Hudson*, 87 F.3d at 1169 ("This court agrees with plaintiff that a reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation. In this case, however, plaintiff has failed to present any evidence of the expected duration of her impairment as of the date of her termination.")

Here, Punt made some requests for time off relating to medical matters.  These include asking Wilgus for time off for the biopsy (Doc. # 65-1 at 29), asking Hansen for time off for appointments (*id.* at 5), and her December 5 email to Wilgus in which she stated that it was in her "best interest not to come to work this week at all . . . surgery takes some appointments and tests," (*id.* at 35–36).  In a later email, Punt further stated that "I don't know how I can come to work tomorrow . . . **if taking a week off** is out of

the question I understand [ . . . ] this is looking like very early stage breast cancer that will allow me to come to work and have only five times of radiation." (*Id.* at 34–35) (emphasis added).

Punt argues that these emails constituted a request for a reasonable accommodation. However, although Punt did state that she believed that she would only need five radiation sessions, and although she did request to take the rest of that week off,[10] this email is not definite enough to have constituted a request stating the expected duration of the impairment. Indeed, by stating that "surgery takes some appointments and tests," she acknowledges that she may need more time away than the five radiation sessions, and that the extent of her need for time away is uncertain. Because Punt failed to state how far into the future her treatment would last, how much time away from work any radiation session would take, and how much time, if any, the additional appointments and tests may take, this email does not set forth a request for a reasonable accommodation of leave time.

Even to the extent that these emails could be interpreted as a sufficiently definite request for leave time and a statement about the expected duration of her impairment, the requests were made to Erin Wilgus, an employee of Kelly, not to GE. The only possible evidence that exists which shows that Punt alerted **GE** to her desire for an accommodation was that she asked Joy Hansen, a GE employee, for time off for specific doctor's appointments and diagnostic tests. (Doc. # 65 at 5). However, Punt failed to inform GE of her desire for **future** leave time, and failed to inform GE about the

---

[10] GE states that this email is not even a request, but instead, just a statement by Punt that she will not be coming to work.

expected duration of impairment.  As such, Punt has failed to carry her burden to show

that she was "qualified" with a reasonable accommodation to perform the essential

functions of her job.  *See Mason v. Avaya Commc'ns*, Inc., 357 F.3d 1114, 1122 (10th

Cir. 2004) (noting that the Tenth Circuit has "consistently held" that "an employee's

request to be relieved from an essential function of her position is not, as a matter of

law, a reasonable or even plausible accommodation.")  As such, the Court finds that

Punt fails to meet her burden of establishing the second element of her *prima facie*

case.

### d. Whether GE's Legitimate, Nondiscriminatory Reason for Punt's Termination Was Pretextual

Despite failing to establish a *prima facie* case, in an abundance of caution, the

Court will assume (without deciding) that Ms. Punt has demonstrated a genuine issue of

fact as to the third prong of the *prima facie* case, and will also analyze whether the

legitimate, nondiscriminatory reason for Punt's termination was pretextual.  *See Brady*

*v. Office of Sergeant at Arms*, 520 F.3d 490, 492 (D.C. Cir. 2008) ("the question

whether the plaintiff in a disparate-treatment discrimination suit actually made out a

*prima facie* case is almost always irrelevant when the district court considers an

employer's motion for summary judgment or judgment as a matter of law.")

As is apparent from the background information provided above, GE has met its

burden to offer a legitimate, nondiscriminatory reason for her termination, by stating that

Punt was fired because of her excessive absenteeism, given the undisputed job

requirement of her physical presence as the receptionist.  Accordingly, to survive

summary judgment, the burden shifts back to Punt to put forth evidence that this reason

was unworthy of belief.  *See Johnson*, 594 F.3d at 1217 (describing burden-shifting

process); *Randle v. City of Auror*a, 69 F.3d 441, 452 (10th Cir. 1995) (internal quotation

omitted) ("Pretext may support a factual conclusion of discrimination. . . . Thus,

establishing pretext gets a plaintiff over the hurdle of summary judgment.")

GE claims that Punt has no evidence that the reason it gave for terminating her

assignment was not the true reason.  (Doc. # 54 at 19.)  As has been previously

discussed, Punt did not analyze her ADA claim using the *McDonnell Douglas* burden-

shifting framework (either in her response to the instant Motion or in her Sur-Reply

brief); as such, she did not characterize or discuss any of the evidence in her case as

being indicative of pretext.  However, because the summary judgment standard requires

that the Court construe the undisputed material facts in favor of the non-movant, the

Court examines the facts that Punt could have put forth had she addressed the issue of

pretext.

"When assessing whether [a] plaintiff has made an appropriate showing of

pretext, [the Court] must consider the evidence as a whole."  *Danville v. Reg'l Lab*

*Corp.,* 292 F.3d 1246, 1250 (10th Cir. 2002).  Additionally, the Court examines the facts

"as they appear to the person making the decision to terminate [the] plaintiff."  *Kendrick*

*v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1231 (10th Cir. 2000).  In other words,

the Court may not act as a "super personnel" department and second guess the

business judgment of the employer; instead, the relevant question is whether the reason

articulated by the employer was the real reason for the challenged action.  *Selenke v.*

*Med. Imaging of Colorado*, 248 F.3d 1249, 1266 (10th Cir. 2001); *see also Rivera v.*

*City and Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004) ("[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.")

Pretext can be demonstrated by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan,* 108 F.3d at 1323 (internal quotation omitted).  For example, a plaintiff may show pretext "with evidence that  . . . [she] was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Salguero v. City Of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004).  Although temporal proximity between an employer's awareness of an employee's protected status and its adverse employment action may be relevant to the question of pretext, the Tenth Circuit has never allowed "even very close temporal proximity [alone] to operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext . . . [r]ather, to show pretext [the plaintiff] must . . . present evidence of temporal proximity **plus** circumstantial evidence of [improper] motive." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1290 (10th Cir. 2007).  Finally, "mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988); *see also Morgan,* 108 F.3d at 1324

(noting that even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations standing alone will not defeat summary judgment).

Applying these principles to the instant case, Punt has failed to offer evidence from which a reasonable factfinder could conclude that GE's reasons for terminating her employment were pretextual.  Indeed, Punt does not contest (1) the extent of her absences, (2) that it is reasonable for an employer to terminate an employee for excessive absences, or (3) that it is reasonable for an employer to expect a new employee to maintain perfect attendance.  Instead, she challenges the legitimacy of GE's decision on other grounds.  As discussed above, Punt asserts that the "unreliable" comment shows that GE was not truly concerned about her absences, but rather, was discriminating against her based on her cancer diagnosis.  Again, even if the Court fully credits Punt's evidence of this statement, it is not sufficient to render GE's rationale for her termination "unworthy of belief," especially when compared with the extensive and undisputed record of her absences, tardiness, and early departures, as well as the undisputed importance of her presence at work.  *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000) (noting that an employer is entitled to summary judgment when "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.")  In any case, this evidence, even when fully credited, is merely Punt's **own conjecture** about GE's ulterior motives for her termination, supported by nothing more than her own testimony about a single,

ambiguous remark.  As such, it is insufficient evidence to defeat the instant Motion.  *See*

*Morgan,* 108 F.3d at 1324 (employee's own allegations insufficient to defeat summary

judgment); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998)

("stray remarks . . . are insufficient to establish pretext"); *Cone,* 14 F.3d at 531 (in age

discrimination context, "isolated [or] ambiguous comments are too abstract . . . to

support a finding of . . . discrimination.")

Similarly, Punt conclusorily characterizes GE's termination of her assignment as

a decision that was based on her "absences for her cancer tests."  (Doc. # 65 at 13.)

However, there is **no evidence** (other than the already-discussed "unreliable" comment)

that the underlying **reason** for her absences (i.e., her cancer) caused GE to terminate

her assignment.  That some (but not all) of her absences in fact occurred on dates on

which she had cancer-related doctor appointments is not probative of pretext, as this

mere correspondence is not enough to cast significant doubt on GE's reasons for

terminating her, either.  Again, although Punt states that she asked Hansen for time off

for some appointments, the actual extent of these requests is unclear.  Even if Punt

asked for permission each time she was absent for a doctor's appointment, this does

not account for the other, unexplained absences, or for the fact that even though GE

may have granted permission on individual occasions, it could have found her non-

medical absences to be excessive in the aggregate.

Punt also fails to compare her situation to any similarly situated comparator

outside of the protected class, nor does she provide evidence that GE otherwise

tolerated repeated absences by other employees.  First, as in *Morgan*, another case of

alleged disability discrimination where the plaintiff had extensive documented absences from work, Punt points to no other person with "a record of unscheduled absences similar to her own."  *Morgan*, 108 F.3d at 1324 (finding no evidence of pretext). Second, although Punt noted that GE has, in the past, provided leave time to employees for surgery or chemotherapy, she admits that she would not have been entitled to this leave time because she "purportedly" was not an employee of GE.  (Doc. # 65 at 7.)[11]  Similarly situated employees are those "who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline," and the Court compares "the relevant employment circumstances, such as work history and company policies . . . in determining whether [employees] are similarly situated."  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).  As such, GE's full-time employees are **not** similarly situated employees by virtue of their differing employment status.  *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 532-33 (10th Cir. 1994) (finding that other employees were not similarly situated to plaintiff "[w]ithout comparisons controlling for occupational dissimilarity and for similarity in available openings at the end of the leave of absence").  Because Punt was a temporary employee of GE, and because she did not provide evidence as to the job duties of GE employees who were given leave time, she fails to establish that she was treated differently than a similarly-situated comparator.[12]

---

[11] Presumably, Punt made this point to show that requesting an accommodation would have been futile, though she does not actually make this argument in her briefs.

[12] Because Punt did not make a request for an ongoing, prospective accommodation, her situation may even not be comparable to permanent GE employees – regardless of their

Additionally, Punt alleges some facts that suggest that GE would, in fact, have been able to accommodate her need for absences in the future, including the fact that another GE receptionist covered her receptionist position on occasion, and that Punt was able to schedule her chemotherapy appointments during her lunch break at her next position.  (Doc. # 65 at 7–8; 9–10.)  However, whatever future accommodations GE could have provided – even assuming that Punt properly made a leave request – do not cast doubt on GE's rationale for terminating Punt's assignment, particularly in light of her of her undisputed documented absences, and it is not for the Court to judge whether GE's proffered reason for terminating Punt due to her excessive absences was "wise, fair or correct," but rather, "whether [GE] honestly believed th[at] reason[] and acted in good faith upon [it]."  *See Rivera*, 365 F.3d at 924–25.

Finally, there is temporal proximity between GE learning of her disability and it terminating her assignment.  However, in the absence of any other probative evidence of pretext – especially because, given the brief duration of Punt's employment at GE, by definition, any adverse action would have been temporally proximate – this temporal proximity alone is insufficient to establish that GE's reason for terminating Punt was pretextual.  *See Campbell*, 478 F.3d at 1290.

In sum, even assuming that Punt sustained her burden to show a *prima facie* case, Punt fails to show a genuine issue of material fact as to whether GE's reason for

---

employment status – particularly if they did not have numerous unexplained absences prior to their requests for leave.  *Cf. Salguero*, 366 F.3d at 1177 (no pretext where evidence showed that plaintiff's conduct was more culpable than conduct of other employees who were not terminated, noting that the court is not to act "as a super personnel department that second guesses employers' business judgments.")

her termination was pretextual.  As such, GE is entitled to summary judgment on Punt's

ADA claim.

## 2. PUNT'S GENETIC INFORMATION DISCRIMINATION CLAIM AGAINST GE AND KELLY

Both GE and Kelly argue that Punt is unable to sustain a *prima facie* case of

genetic information discrimination because there is no evidence that Punt's family

medical history constitutes genetic information, that she shared this history with any GE

employee, or that her termination was because of her genetic information.  (Doc. ## 50

at 18–20; 54 at 19–20.)  Both also contend that Punt is unable to show any evidence

that its legitimate, non-discriminatory reason for her termination was pretextual.  (*Id.*)

Punt counters that her family history constitutes genetic information and that the

"unreliable" comment coupled with GE's termination for "absences surrounding her

cancer treatment" would permit a jury finding that that she was terminated because of

GE's assumptions about the required course of treatment based on her family history.

(Doc. # 65 at 20.)  The Court finds that because Punt does not put forth sufficient

evidence to show that GE terminated her **because of** genetic information, or that the

legitimate, nondiscriminatory reason it proffered was pretextual, summary judgment for

GE and Kelly is proper on Punt's GINA claim.

GINA makes it illegal for employers to terminate or otherwise discriminate

against an employee because of the employee's genetic information.  42 U.S.C.A. §

2000ff–1(a)(1) (2015).  Genetic information includes any information about "the

manifestation of a disease or disorder in family members of such individual."  42 §

2000ff(4)(A); *see also* 29 C.F.R. § 1635.3(c).  Since its passage in 2008, the Tenth

Circuit has not had occasion to analyze a GINA claim (nor have the district courts within

the Tenth Circuit), and the sparse case law that does exist is unsettled as to whether

plaintiff can sustain a GINA claim at summary judgment by proffering sufficient evidence

to show that the employer took an adverse action **because of** the employee's qualifying

genetic information, or whether such a showing also triggers a burden-shifting scheme

akin to the *McDonnell-Douglas* framework.[13]   Nevertheless, the Court agrees that a

burden-shifting framework should apply to Punt's GINA claim for the same reasons it

applied such a framework to Punt's ADA claim, particularly in light of the fact that GINA

was codified in Title VII (that is, the original source of the *McDonnell Douglas*

framework), and plainly tracks the language and remedies of Title VII's anti-

discrimination provisions.[14]   *See Conner-Goodgame v. Wells Fargo Bank, N.A.,* No.

---

[13] *Compare, e.g., Leone v. N. Jersey Orthopaedic Specialists, P.A.*, No. CIV.A. 11-3957 ES, 2012 WL 1535198, at *5 (D.N.J. Apr. 27, 2012) (required showing is "(1) that [the plaintiff] was an employee; (2) who was discharged or deprived of employment opportunities; (3) because of information from [her] genetic tests"), *and Allen v. Verizon Wireless*, No. 3:12-CV-482 JCH, 2013 WL 2467923, at *23 (D. Conn. June 6, 2013) (same; "the issue is whether Allen alleges that Verizon considered her genetic information in deciding to deny her request for [short-term disability]"), *with* Ortiz v. City of San Antonio Fire Dep't, No. 15-50341, 2015 WL 7423019, at *4 (5th Cir. Nov. 18, 2015) (affirming district court's "borrowing" of the *McDonnell Douglas* burden shifting framework in GINA case, "which the parties appear to agree was appropriate"); *Conner-Goodgame v. Wells Fargo Bank*, N.A., No. 2:12-CV-03426-IPJ, 2013 WL 5428448, at *10 (N.D. Ala. Sept. 26, 2013) (analyzing a plaintiff's GINA claim under Title VII's anti-retaliation framework); *Garnett-Bishop v. New York Cmty. Bancorp, Inc.*, 49 F. Supp. 3d 321, 327-28 (E.D.N.Y. 2014) (in case with consolidated discrimination claims of multiple employees, including some with GINA claims, noting that "the familiar burden shifting framework . . . will still apply").

[14] *Compare* GINA, 42 U.S.C. 2000ff-1(a) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee"), *with* Title VII, 42 U.S.C.A. § 2000e-2 ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or

2:12-CV-03426-IPJ, 2013 WL 5428448, at *10 (N.D. Ala. Sept. 26, 2013) ("[b]ecause GINA's anti-retaliation provision tracks the language of Title VII's anti-retaliation provision, the court has analyzed Plaintiff's retaliation claim under Title VII's framework for retaliation"), *Garnett-Bishop v. New York Cmty. Bancorp, Inc.*, 49 F. Supp. 3d 321, 327-28 (E.D.N.Y. 2014)  (in case with consolidated discrimination claims of multiple employees, including some with GINA claims, "with regard to the different discrimination causes of action, the familiar burden shifting framework . . . will still apply").

   That Punt's mother, grandmother, great-grandmother, cousin, and aunt all were diagnosed with breast cancer is the type of genetic information implicated by GINA, as "the manifestation of a disease or disorder in family members."  42 U.S.C. § 2000ff(4)(A).  However, as with her disability discrimination claim, Punt failed to allege sufficient evidence to show that GE's decision to terminate her (or Kelly's acquiescence in this decision) was based on this genetic information or that GE's nondiscriminatory reasons (i.e., her attendance) was pretextual.  Punt can assert only that she told Kelly employees about her family history of breast cancer; the parties dispute whether she told Hansen at GE about this family history or whether Sledge was aware of it.  Even if the Court credits Punt's testimony that she did tell Hansen and that Sledge was indeed aware, again, GE's and Kelly's knowledge alone is insufficient to show that this genetic information in particular somehow **contributed to** GE's termination decision.  The "unreliability" statement is even **less** indicative of causation in the genetic information

---

privileges of employment, because of such individual's race, color, religion, sex, or national origin.")  GINA also provides that the procedures and remedies afforded by Title VII also apply under GINA, with certain limited exceptions.  42 U.S.C. 2000ff-6(a).

context, despite Punt's attempt to characterize it as being related to GE's "assumptions

about the needed course of treatment **based on her genetic information**," because it

in no way refers to genetic information of any kind, but only to Plaintiff's own breast

cancer.  (Doc. # 65 at 20.)  For these reasons, Punt also fails to establish a claim under

GINA, against either GE or Kelly.

## B.  KELLY'S MOTION FOR SUMMARY JUDGMENT

Among many other arguments, Kelly contends that Punt's claims against it must

fail because GE's termination of Punt's assignment was not an "adverse action" taken

**by Kelly** against Punt, as Punt continued to be employed by Kelly, understood that the

length of her assignments would be determined by Kelly's customer (that is, GE), and

that at the end of any assignment, it was Punt's obligation to maintain regular contact

with Kelly to apprise Kelly of her availability for work, but that she did not do so.  (Doc. #

50 at 16.)

Although such an argument might appear persuasive at first blush, the Court

finds that it does not adequately account for Kelly's own obligations as a joint employer

of Punt[15] to ensure that its employees are not exposed to discrimination.  Punt cites

*Burton v. Freescale Semiconductor*, Inc., 798 F.3d 222 (5th Cir. 2015), which held that

"[a] staffing agency is liable for the discriminatory conduct of its joint-employer client if it

**participates in the discrimination**, or if it **knows or should have known of the**

**client's discrimination but fails to take corrective measures within its control**."  *Id.*

at 229 (emphasis added).  The Tenth Circuit has yet to rule on the extent of joint

---

[15] For the purposes of the following analysis, the Court assumes, without deciding, that GE and Kelly were "joint employers" of Punt.

33

employer liability under these circumstances.  *See Sandoval v. City of Boulder,* 388

F.3d 1312, 1324, n.4 (10th Cir. 2004) ("Because we find no joint employer relationship

we need not reach the question of what the scope of one joint employer's vicarious

liability would be for actions of its partner in which it did not participate or over which it

had limited or no control.")  However, this so-called "duty to protect" theory has also

been acknowledged by the Second and Seventh Circuits in the cases involving joint

employers.  *See Lima v. Adecco*, 375 Fed. App'x. 54 (2d Cir. 2010) ("We also agree

with the District Court that even if Adecco and Platform could be considered a 'joint

employer,' Adecco could not be held liable to plaintiff based on that legal theory

because there is no evidence that Adecco either knew or should have known about any

of the alleged discrimination [by Platform]."); *Whitaker v. Milwaukee Cnty.*, 772 F.3d

802, 812 (7th Cir. 2014) ("Here, nothing in the record suggests that the County

participated in the alleged discriminatory conduct or failed to take corrective measures

within its control.").  The theory also finds support in the EEOC's Compliance Manual,

which examines the specific context of temporary employment agencies sending

employees to client employers, and concludes that

> The [temporary staffing] firm is liable if it **participates in** the client's
> discrimination.  For example, if the **firm honors its client's request to
> remove a worker from a job assignment for a discriminatory reason**
> and replace him or her with an individual outside the worker's protected
> class, the firm is liable for the discriminatory discharge.  **The firm also is
> liable if it knew or should have known about the client's
> discrimination and failed to undertake prompt corrective measures
> within its control**.

EEOC, No. 915.002, Enforcement Guidance: Application of EEO Laws to Contingent

Workers Placed by Temporary Employment Agencies and Other Staffing Firms, 1997

34

WL 33159161, at *10 (emphasis added). [16]   The Court is sufficiently persuaded by the

"duty to protect" theory set forth by the other Circuit Courts of Appeals and the EEOC

such that it sees no reason to deviate from it here; however, it finds that Punt has still

failed to state a claim for disability discrimination against Kelly under such a theory.

Punt contends that Kelly should be held responsible for GE's alleged

discrimination under the standard quoted above because

> Kelly knew of the discrimination because this was clearly a failure to
> accommodate case and it had the same knowledge of plaintiff's condition
> and her need for further time off to address her cancer as GE did.  Yet Ms.
> Wilgus did not even bother to try to address it with GE.  A jury could find
> that Kelly **approved of GE's conduct because it made no effort to
> discuss with Hansen a reasonable accommodation for plaintiff and
> because it provided GE with a replacement employee**.

(Doc. # 64 at 21) (emphasis added).  It bears mention that the bulk of Punt's complaint

involves allegations against GE; she places bases virtually her entire ADA claim on the

conduct of GE.  And, as the Court has already discussed, in failing to (1) sustain her

*prima facie* case of disability discrimination against GE (specifically because she failed

to make a request for a reasonable accommodation to GE); and (2) show that GE's

legitimate, nondiscriminatory reasons for her termination were pretextual, Punt has

failed to show that she was terminated for a discriminatory reason by GE.  Accordingly,

Punt necessarily cannot show that Kelly either "participated in" GE's discrimination or

---

[16] Although it is not controlling upon the courts, "by reason of [its] authority," EEOC Guidance
constitutes "a body of experience and informed judgment to which courts and litigants may
properly resort for guidance."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).  *See
also Univ. of Tex. Sw. Med. Ctr. v. Nassa*r, 133 S. Ct. 2517, 2540 (2013) ("[t]he position set out
in the EEOC's guidance and compliance manual merits respect.")

that Kelly knew or should have known about this discrimination but failed to take corrective measures within its control.  *See Burton*, 798 F.3d at 229.

## IV.  <u>CONCLUSION</u>

Based on the foregoing, it is ORDERED that GE and Kelly's Motions for Summary Judgment are GRANTED (Docs. ## 50, 54).  It is

FURTHER ORDERED that this case is DISMISSED WITH PREJUDICE, and that the Final Trial Preparation Conference set for February 25, 2016, and the five-day Jury Trial set to commence on March 7, 2016, are hereby VACATED.

It is FURTHER ORDERED that Defendants shall have their costs by the filing of a Bill of Costs with the Clerk of the Court.  Each party shall bear its own attorney fees.

DATED:  January 6, 2016

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge